William F. King (023941)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016
Telephone: (602) 530-8000
Facsimile: (602) 530-8500
Email: bill.king@gknet.com

Andrew S. Friedman (005425)
Francis J. Balint, Jr. (007699)
BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
7301 N. 16th Street, Suite 102
Phoenix, Arizona 85020
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
Email: afriedman@bffb.com
       fbalint@bffb.com

Attorneys for Plaintiff

UNITED STATED DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Kristen Stewart, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Aspen Group Incorporated; Aspen University, Inc.,<br><br>Defendants. | Case No.: 22-cv-00818-PHX-DLR<br><br>**Motion for Final Certification of Settlement Class, Approval of Proposed Class Settlement, and Approval of Defendants' Payment of Class Fees, Litigation Expenses, and Service Award** |

**I.     Introduction**

Plaintiff/Class Representative Kristen Stewart ("Plaintiff") respectfully moves the Court for final approval of the proposed class settlement (the "Proposed Settlement") of class claims alleged against Defendants Aspen Group Incorporated and Aspen University, Inc. (collectively, "Aspen"), through the certification of a single settlement class of students previously enrolled for at least fifteen hours in Aspen's BSN Pre-Licensure Program (the "Settlement Class").

Plaintiff in her Complaint (Dkt. 1-3) alleges Aspen violated Arizona's Consumer Fraud Act ("ACFA"), A.R.S. § 44-1522 *et seq.*, by failing to disclose to her and members of the proposed Settlement Class multiple, material facts specific to Aspen's Arizona BSN Pre-Licensure Program, as set forth in part in the Arizona State Board of Nursing's "Notice of Charges" dated February 18, 2022 (Dkt. 1-3 at ECR 26). Aspen denies Plaintiff's allegations, but worked with Plaintiff to efficiently identify and address the factual and legal issues in dispute through informal and formal discovery productions and exchanges, which was later followed by a lengthy private mediation before respected mediator Mark Worischeck of Sanders + Parks, culminating in a compromise settlement creating a common fund in the amount of $550,000.00 (the "Settlement Fund").

The Proposed Settlement in this case provides the Settlement Class immediate, meaningful economic relief: To help offset transfer expenses encountered when Aspen suspended its BSN Program, over 500 former Aspen students will receive $27.25 for every credit hour completed. Under the Plan of Allocation, Settlement Class Members will each receive from a minimum of $408.00 dollars (15 credit hours) to a maximum of $1,308.00 (48 hours), for a total of approximately $382,000.00 in net settlement payment benefits (the "Net Settlement Fund").

Importantly, the Proposed Settlement establishes no onerous "claim process." Instead, upon final approval, Settlement Class Members will receive settlement checks as calculated under the proposed Plan of Allocation. The Proposed Settlement thus affords immediate, meaningful monetary relief to Settlement Class Members, without the delay of protracted litigation in this Court or the Ninth Circuit over claim administration issues. In addition to establishment of the Settlement Fund, Aspen has agreed to pay all costs of preparing and disseminating the Class Notice.

Accordingly, the Court on October 4, 2023 granted Plaintiff's Motion for Preliminary Approval of the Proposed Settlement, and preliminarily certified the Settlement Class. Dkt. 39 (the "Preliminary Approval Order," or "PAO"). The Final Approval Hearing is currently scheduled for February 1, 2024, at 10:30 a.m. *Id.* The Class Notice process has been completed

in the manner prescribed in the Preliminary Approval Order, with December 18, 2023, set as the deadline for members of the Settlement Class either to opt-out or object to the Proposed Settlement. *Id.*

Plaintiff hereby respectfully moves the Court for final approval of the Proposed Settlement, including approval of a common fund award of $137,500.00 in attorneys' fees, of $12,500.00 in litigation expenses, and of $5,000.00 as a service award to Plaintiff/Class Representative Kristen Stewart. Plaintiff does so now, in advance of the December 18, 2023, opt-out and objection deadline, so that members of the Settlement Class can make their decisions on a fully informed basis. Plaintiff also contemplates filing a reply brief in support of this motion at least fourteen (14) days before the Final Hearing, addressing any objection to Court approval that may be lodged by a member of the Settlement Class. In compliance with LRCiv 7.1(b)(2), the Parties will in advance of the Fairness Hearing furthermore lodge proposed forms of the Final Approval Order and the Final Judgment.

Plaintiff's motion is supported by (a) the declaration of Francis J. Balint, Jr. submitted in support of preliminary approval (Dkt. 38-1 ("Balint PA Decl.")), and (b) the Joint Declaration of Francis J. Balint, Jr. and William F. King submitted in support of final approval ("Jt. Decl.").

**II.    Summary of the Common Class Claims**

For times relevant hereto, Aspen operated a for-profit registered nursing degree program in Arizona known as the Pre-Licensure Bachelor of Science in Nursing program (the "BSN Program") at two campus locations: (a) 19602 N. 23rd Ave., Phoenix AZ 85027 ("Main Campus"), and (b) 11811 N. Tatum Blvd. Ste. 4001, Phoenix AZ 85028 ("HonorHealth Campus"). Compl., Dkt. 1-3, ¶ 1. Aspen was licensed to provide the BSN Program by the Arizona State Board for Private Postsecondary Education ("the Arizona Education Board"); specifically, License No. AVD-01679 (Main Campus) and License No. AVD-01691 (HonorHealth Campus). *Id.* ¶ 2. The Arizona State Board of Nursing ("the Arizona Nursing Board") also issued Aspen a provisional approval for a registered nursing program in November 2017, set to expire on July 31, 2022. *Id.* ¶ 3.

1    Aspen offered the BSN Program to prospective students in Arizona, like Plaintiff,
2  through its website and uniform marketing materials. Compl., Dkt. 1-3, ¶ 4. Based on Aspen's
3  description of the BSN Program, Plaintiff applied to Aspen's BSN Program in April 2020 and
4  thereafter enrolled. *Id.* ¶ 5. After commencing her studies at Aspen, however, Plaintiff alleges
5  that, contrary to Aspen's marketing representations to her and other students, Aspen's learning
6  opportunities, faculty resources, quality of instruction, program resources, and its educational
7  and leadership infrastructure were inadequate to support student learning or successful
8  outcomes. *Id.* ¶ 6. Specifically, as a result of Aspen's alleged BSN Program failures, Aspen's
9  2021 first time pass rate for the National Counsel Licensure Examination ("NCLEX-RN") was
10 58.04%, which ranked last in Arizona and fell well below the state's 80% required minimum
11 threshold set by the Arizona Board of Nursing. *Id.* ¶ 7; *see* A.A.C. R4-19-206.G (requiring, *inter*
12 *alia*, Arizona nursing programs to maintain at least an 80% NCLEX pass rate for graduates
13 taking the NCLEX-RN for the first time within 12 months of graduation).

14   Based on this fact and several whistleblower reports from December 2020, April 2021,
15 and September 2021, the Arizona Nursing Board commenced a comprehensive investigation
16 into Aspen's BSN Program. Compl., Dkt. 1-3, ¶ 8. Through its investigation, the Arizona
17 Nursing Board issued to Aspen in February 2022 a "Notice of Charges," which alleged, among
18 other things, that Aspen had engaged in several denominated instances of "[un]professional
19 conduct" as defined under A.R.S. § 32-1601(27) and had committed acts that "deceive[d],
20 defraud[ed] or harm[ed] the public." *Id.* ¶ 9. The Arizona Board of Nursing further specifically
21 concluded that Aspen's actions constituted "unprofessional conduct" based on "[f]raud or
22 deceit in advertising, promoting or implementing the program[.]" *Id.*

23   On the heels of the Arizona Board of Nursing's Notice of Charges, the Arizona
24 Education Board in March 2022 requested, and Aspen agreed (i) to immediately cease
25 enrollments in the BSN Program until it resolved the matter before the Arizona Board of
26 Nursing; (ii) to remove start date information from its website and marketing materials; and
27 (iii) to report to the Arizona Education Board on a monthly basis (including monthly student
28 records). Compl., Dkt. 1-3, ¶ 11. As a result, Plaintiff alleges that hundreds of students were

4

1   left with uncertain futures and potentially untransferable credit hours, in what was described
2   by several media outlets as Aspen's "nursing school nightmare" and "infrastructure collapse."
3   *Id.* ¶ 13.

4         Based on the foregoing facts, Plaintiff alleged Aspen's knowing material
5   misrepresentations and omissions regarding the features of the Aspen BSN Program were false
6   when made, and as such constituted violations of the Arizona Consumer Fraud Act, A.R.S. §
7   44-1522 *et seq.* ("ACFA").  Compl., Dkt. 1-3, ¶¶ 76-94.  Aspen in response denied the material
8   allegations of Plaintiff's Complaint and challenged Plaintiff's class allegations. *See* Answer, Dkt.
9   14, ¶¶ 68-75 (affirmatively alleging, for example, that Plaintiff failed to adequately or properly
10  allege a putative class and denying that "the defined class is subject to class action treatment");
11  *id.* ¶¶ 76-94 (denying Plaintiff's ACFA allegations).

12        After the pleadings closed, the parties engaged in both informal and formal discovery.
13  *See* Balint PA Decl., ¶ 4. With the exception of one discovery dispute, which the Court resolved
14  in Plaintiff's favor (*see* Dkt. 31), the parties worked amicably together and exchanged thousands
15  of pages of documents, which further refined the issues relevant to the merits and Plaintiff's
16  proposed class allegations. *Id.* As a result of their cooperative discovery efforts and Aspen's
17  other, ongoing regulatory challenges, in addition to the fact that Aspen's only applicable
18  insurance policy had depleting limits of $500,000.00, the parties agreed to submit their disputes
19  to mediation before Mediator Worischeck. *Id.* ¶ 5.

20        Mediator Worischeck conducted several pre-mediation discussions to narrow the issues
21  to be addressed at the mediation. Balint PA Decl., ¶ 6. On March 29, 2023, the parties attended
22  a full-day, in-person mediation at Mediator Worischeck's offices in Phoenix. *Id.* ¶ 7. At the
23  end of the day, the parties and counsel signed a term sheet to settle all claims. *Id.* After
24  notifying the Court (Dkt. 37), the parties executed a formal Stipulation of Settlement ("SOS")
25  on September 18, 2023. *See* Dkt. 38-1 at ECR Page 10.

26  **III.  Summary of the Proposed Class Settlement**

27        The Proposed Settlement Class is defined as: "All persons who, during the Class Period,
28  (a) were in the Cohort or (b) had otherwise completed more than 15 hours enrolled in Aspen's

BSN Prerequisite Program in Arizona,[1] but could not enter the BSN Core Program or continue with the BSN Prerequisite Program because of the Arizona Board of Nursing's regulatory actions taken against Defendants." SOS, ¶ 29. "Cohort" means "the 53 students who were enrolled in Aspen's Arizona BSN Program during the Class Period and had been admitted to, but could not commence, Aspen's BSN Core Program because of the Arizona Board of Nursing's regulatory actions taken against Defendants." SOS, ¶ 7. Under the SOS, the "Class Period" runs from February 15, 2022, through September 20, 2022. SOS, ¶ 6. The proposed Settlement Class is thus by definition narrowly defined to include those Aspen students who completed at least 15 credit hours, but could not continue with the BSN Prerequisite Program or enter into the BSN Core Program because of the Arizona Board of Nursing's regulatory actions taken against Defendants. *See* SOS, ¶ 29.

The proposed Plan of Allocation—which is included in the Class Notice—provides how the Settlement Benefit Payment will be apportioned and allocated amongst the 507 Settlement Class Members: Each Settlement Class Member will receive $27.25 per credit hour completed at Aspen, all according to the table set forth below:

| Credit Hours | Payout per Class Member | Number of Settlement Class Members | Settlement Payments |
|---|---|---|---|
| 15 | $408.75 | 27 | $11,036.25 |
| 16 | $436.00 | 19 | $8,284.00 |
| 17 | $463.25 | 21 | $9,728.25 |
| 18 | $490.50 | 20 | $9,810.00 |
| 19 | $517.75 | 16 | $8,284.00 |
| 20 | $545.00 | 35 | $19,075.00 |
| 21 | $572.25 | 9 | $5,150.25 |
| 22 | $599.50 | 24 | $14,388.00 |
| 23 | $626.75 | 38 | $23,816.50 |
| 24 | $654.00 | 6 | $3,924.00 |
| 25 | $681.25 | 19 | $12,943.75 |
| 26 | $708.50 | 38 | $26,923.00 |
| 27 | $735.75 | 1 | $735.75 |

---

[1] Aspen's BSN Program requires completion of a first-year pre-requisite program. Upon completion of the pre-requisite program, students advance into the core curriculum, which is generally a two-year program. Balint PA Decl., ¶ 2 n.1.

| | | | |
|---|---|---|---|
| 28 | $763.00 | 6 | $4,578.00 |
| 29 | $790.25 | 44 | $34,771.00 |
| 30 | $817.50 | 1 | $817.50 |
| 31 | $844.75 | 4 | $3,379.00 |
| 32 | $872.00 | 35 | $30,520.00 |
| 33 | $899.25 | 1 | $899.25 |
| 34 | $926.50 | 7 | $6,485.50 |
| 35 | $953.75 | 26 | $24,797.50 |
| 36 | $981.00 | 0 | $0.00 |
| 37 | $1,008.25 | 0 | $0.00 |
| 38 | $1,035.50 | 23 | $23,816.50 |
| 39 | $1,062.75 | 0 | $0.00 |
| 40 | $1,090.00 | 0 | $0.00 |
| 41 | $1,117.25 | 86 | $96,083.50 |
| 48 | $1,308.00 | 1 | $1,308.00 |
| **TOTALS** | | **507** | **$381,554.50** |

Upon Final Approval, Aspen will deposit the funds for distribution to the Settlement Class in an escrow account at Alliance Bank, who will then in turn issue and mail the settlement checks to Settlement Class Members. Balint PA Decl., ¶ 18; *see also* SOS, ¶¶ 34, 41.

Through the "Class Notice," as defined in the SOS, every member of the Settlement Class is being sent direct mailed notice of the Proposed Settlement in a form previously approved by the Court. PAO, ¶ 7; SOS, ¶¶ 45-52. The Class Notice describes the Proposed Settlement and clearly explains how any person may (a) exclude him or herself from the Settlement Class or (b) object to any aspect of the Proposed Settlement as a member of the Settlement Class. *See* PAO ¶¶ 12, 13; SOS, ¶¶ 14-18. The Class Notice also specifically includes the Plan of Allocation, which sets forth the amount each participating Settlement Class Member will receive according to the number of credit hours he or she completed. SOS, ¶ 10.

Finally, the terms of the Class Release (defined in the SOS) are narrowly drawn: As due process requires, the Class Release is limited to claims which are "based on the same factual predicate" alleged in the Complaint. SOS, ¶ 68.

7

## IV. The Court Should Grant Final Certification of the Settlement Class

Cognizant of its duty to scrutinize class certification for settlement purposes, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), the Court in its Preliminary Approval Order carefully assessed Plaintiff's satisfaction of each requirement under Rule 23(a) and 23(b)(3). *See* PAO, at 1:16-28. Nothing has changed since the Court's preliminary certification to undermine the soundness of the Court's ruling that certification of the Settlement Class is fully warranted here. *See* Jt. Decl., ¶¶ 45-50. The Court should, therefore, grant final certification of the Settlement Class. *See, e.g.*, *Rodriguez v. QS Next Chapter LLC*, No. CV-20-00897-PHX-DJH, 2021 WL 1307612, at *1 (D. Ariz. Apr. 7, 2021) (granting final certification of settlement class premised on unchanged showing made in support of preliminary certification).

## V. The Court Should Grant Final Approval of the Proposed Settlement

Under the governing standards, and for the reasons presented below, the Proposed Settlement should be finally approved.

### A. Applicable Standards Governing Final Class Settlement Approval

"Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d at 1027); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (reasoning a class action settlement should be reviewed under "the universally applied standard [of] whether the settlement is fundamentally fair, adequate and reasonable"). Factors traditionally considered in the final approval process include: (a) the relative strength of the plaintiff's alleged class claims; (b) the strength of the defendants' alleged defenses; (c) the benefits to the class; (d) the complexity, expense, and probable duration of further litigation; (e) the risk and delay inherent in possible appeals; and (f) the risk of collecting any judgment obtained on behalf of the class. *Rodriguez*, 2021 WL 1307612, at *1.

### B.     All of the Traditionally Considered Factors Support Final Approval

A settlement should be approved if "it is fundamentally fair, adequate and reasonable." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citation omitted). This determination requires "a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Officers for Justice*, 688 F.2d at 625. This list is not exclusive and different factors may predominate in different factual contexts. *Id.*

<u>The Relative Strength of the Class Claims</u>. Plaintiff remains convinced of the merit of the claims; but a clear-eyed assessment reveals several daunting hurdles to securing through continued litigation prompt, class-wide relief based on Aspen's alleged ACFA violations. Jt. Decl., ¶ 9. Aspen has never conceded liability at any level, instead vigorously contesting the merits of the claims and defenses at issue throughout the case, including Plaintiff's ability to secure a certified class. *Id.* ¶¶ 10-12; *see also* Balint PA Decl., ¶ 3. Throughout the mediation process, the respective arguments and counter-arguments and other practical considerations were urged to (and vetted by) Mediator Worischeck, forcing the Parties to candidly articulate and evaluate the strengths and weaknesses of their claims and defenses. Jt. Decl., ¶ 10; Balint PA Decl., ¶¶ 11-20.

<u>The Risk, Expense, Complexity, and Likely Duration of Further Litigation</u>. If Plaintiff's claims were certified and proceeded to trial, those claims would certainly present a battle of persuasion on several discrete issues of law, with the Parties advancing starkly different, competing interpretations of the challenged ACFA violations and damage models. Jt. Decl., ¶ 12; Balint PA Decl., ¶¶ 12-13. Plaintiff thus faced a very real risk of **zero recovery** for herself and the putative class comprising hundreds of former Aspen students. Jt. Decl., ¶ 12; Balint PA Decl., ¶ 14. There is also no doubt that, absent a settlement agreement, Plaintiff would

9

face one or more summary judgment motions, as well as post-trial motions and appeals, all of which would have greatly delayed any recovery for class members. Jt. Decl., ¶ 11; Balint PA Decl., ¶¶ 13-15. Plaintiff furthermore appreciated the risks associated with both obtaining and then maintaining class action status throughout the trial, particularly in light of Aspen's forceful, accelerated attacks on commonality and predominance and Plaintiff's proposed damages model. Jt. Decl., ¶ 11.

In short, proceeding to trial in this action would have been costly and risky, with no guarantee of recovery and the possibility for protracted appeals. Each of these considerations supports final approval of the Proposed Settlement. *See, e.g.*, *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

<u>The Settlement's Benefits Relative to the Strengths and Risks</u>. Weighing the foregoing considerations, Aspen's agreement to provide monetary payouts in excess of $380,000.00 to 507 students ranging from a minimum of $408.00 dollars (15 credit hours) to a maximum of $1,308.00 (48 hours), without the risk and delays of continued litigation, trial, and appeal, or an onerous claims process, undeniably provides a meaningful economic recovery to hundreds of former Aspen students, especially in light of Aspen's $500,000.00 depleting insurance limits and other ongoing regulatory and financial challenges. Jt. Decl., ¶¶ 14-15. And though the reaction of class members to the Proposed Settlement is presently unknown, there have been no objections filed with the Court to date. *Id.*, ¶ 23.

The direct monetary benefit to the Settlement Class here is further enhanced by Aspen's additional agreement to pay all costs of Class Notice. Jt. Decl., ¶ 16; Balint PA Decl., ¶ 19. Many courts have recognized that the defendant's agreement to pay settlement notice costs is appropriately considered as an additional benefit to be added to the settlement valuation determination. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 974–75 (9th Cir. 2003); *Feller v. Transamerica Life Ins. Co.*, No. 16-cv-01378 CAS (GJSx), 2019 WL 6605886, at *5 (C.D. Cal. Feb. 6, 2019).

<u>The Extent of Discovery Completed and the Stage of the Proceedings</u>. As the Court is aware, the Parties approached this litigation in a highly efficient manner, in which informal and

formal discovery were accelerated, in part, due to Aspen's depleting $500,000.00 policy of insurance and other on-going regulatory challenges. Balint PA Decl., ¶¶ 4-5; Jt. Decl., ¶ 17. Doing so forced the Parties to quickly come to terms with the respective strengths and weaknesses of their positions, eliminating any doubt that counsel "had a good grasp on the merits of their case before settlement talks began." *Rodriguez*, 563 F.3d at 967. Only then did the Parties agree to explore a potential voluntary resolution, and even then, only through mediation before a highly experienced and mutually agreed-upon mediator. Balint PA Decl., ¶¶ 11-16; 30; Jt. Decl., ¶¶ 18-19; *see e.g.*, *Satchell v. Fed. Express Corp.*, Nos. C03–2659 SI, C 03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

<u>The Experience and Views of Counsel</u>. Courts recognize that the opinions of experienced counsel supporting a settlement after vigorous arm's-length negotiations are entitled to considerable weight in the final approval analysis. *See, e.g.*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1392 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) (noting that "[c]ounsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions") (citation omitted); *In re Apollo Grp. Inc. Sec. Litig.*, Nos. CV 04–2147–PHX–JAT, CV 04–2204–PHX–JAT, CV 04–2334–PHX–JAT, 2012 WL 1378677, at *2–3 (D. Ariz. Apr. 20, 2012). Plaintiff's Counsel here have extensive experience litigating ACFA cases and class action cases, having achieved class action settlements approved by many courts across the country and recovered substantial monetary benefits for class members. *See* Balint PA Decl., ¶ 30; Dkt. 38-1 at ECR 70-84; Jt. Decl., ¶ 20; Exhibits A and B. Based on that experience, Plaintiff's Counsel unequivocally endorse the proposed Settlement. Balint PA Decl., ¶ 33; Jt. Decl., ¶¶ 8, 20-21, 51.

<u>The Presence of a Governmental Participant</u>. While the Arizona Board of Nursing investigated Aspen's business practices from a regulatory perspective and issued several orders specific to Aspen's licensure with the State of Arizona, it did not provide Aspen's former students any monetary relief to help offset the financial impact of Aspen's challenged conduct.

Jt. Decl., ¶ 22. The common fund was created solely through the efforts of Plaintiff and Plaintiff's Counsel. *Id.*

The Reaction of the Settlement Class Members to the Proposed Settlement. The deadline for exclusions and objections is December 18, 2023. PAO, ¶¶ 15-21. To date, there has been no objection to any aspect of the Proposed Settlement; indeed, the Settlement Class members who have contacted Class Counsel in response to receiving notice of the settlement have expressed satisfaction with the result. Jt. Decl., ¶ 23.

**VI. The Court Should Approve Settlement Common Fund Payment of the Requested Amounts of Attorneys' Fees and Litigation Expenses**

Plaintiff's Counsel are entitled to a common fund fee award to compensate them for the benefits they generated on behalf of the Settlement Class. *Staton*, 327 F.3d at 967 ("Under the 'common fund' doctrine, 'a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'") (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

**A.   The Amount of Farmers' Fee Payment Is Reasonable**

In determining the reasonableness of attorneys' fees in class action settlements, the district court has discretion to use either a percentage or lodestar method. *Hanlon*, 150 F.3d at 1029. As the Ninth Circuit has explained, however, "the primary basis of the fee award remains the percentage method," while "the lodestar may provide a useful perspective on the reasonableness of a given percentage award." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002) ("*Vizcaino II*"); *see also Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (approving calculation of attorneys' fees in common fund class action based on percentage of the total fund).

In class common fund cases, "'the 'benchmark' [fee] award is 25 percent of the recovery obtained,' with 20-30% as the usual range." *Vizcaino II*, 290 F.3d at 1047 (citation omitted). Under Ninth Circuit jurisprudence, this benchmark is applied to the value of the entire common benefit secured by class counsel, regardless of the extent to which the members of the settlement class ultimately choose to avail themselves of that benefit. *See Williams v. MGM-*

12

*Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (holding that "the district court abused its discretion by basing the fee on the class members' claims against the fund rather than on a percentage of the entire fund or on the lodestar"); *Young v. Polo Retail, LLC*, No. C-02-04546 VRW, 2007 WL 951821, at *8 (N.D. Cal. Mar. 28, 2007) (same) (citing *Williams*); *Carlotti v. ASUS Computer Int'l*, No. 18-cv-03369-DMR, 2020 WL 3414653, at *6 (N.D. Cal. June 22, 2020) ("It is not appropriate to base attorneys' fees based only on the amount paid to class members who submitted claims.") (citing *Williams*).

Applying the Ninth Circuit's 25% benchmark to the $550,000.00 Settlement Common Fund here justifies a fee of $137,500.00. Jt. Decl., ¶ 26.

### B. Plaintiffs' Counsel's Fee Request Is Fully Supported by the Lodestar Cross-Check and Results in a Negative Multiplier

To confirm the reasonableness of a requested percentage fee award, the Court may in its discretion also conduct a lodestar "cross-check." *See Vizcaino II*, 290 F. 3d at 1050; *accord In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 261–65 (N.D. Cal. 2015). If the multiplier falls within an acceptable range, it supports the conclusion that the percentage fees sought are, in fact, reasonable. *See Vizcaino II*, 290 F.3d at 1051; *see generally In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 571–72 (9th Cir. 2019) (finding multipliers of 1.22 and 1.55 to be "modest or in-line with others we have affirmed").

Because a "lodestar cross-check calculation need entail neither mathematical precision nor bean counting," the Court may rely on sworn lodestar summaries submitted by the attorneys rather than tediously reviewing line-by-line billing records. *Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *6 (N.D. Cal. Mar. 6, 2014) (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005)); *Sanchez v. Frito-Lay, Inc.*, No. 1:14-cv-00797-DAD-BAM, 2021 WL 1813190, at *10 (E.D. Cal. May 6, 2021) ("[C]ounsels' declarations are sufficient to establish the number of attorney and staff hours worked on this matter.") (citation omitted). Reasonable hourly rates are determined by looking to "the rate prevailing in the community for similar work performed by attorneys of comparable skill,

experience, and reputation." *Schwarz v. Sec'y of Health & Hum. Servs.*, 73 F.3d 895, 908 (9th Cir. 1995) (citation omitted); *Am. C.L. Union of Ariz. v. United States Dep't of Homeland Sec.*, No. CV-17-01083-PHX-DJH, 2020 WL 1494328, at *5 (D. Ariz. Mar. 27, 2020).

Here, based on hourly rates consistent with those previously approved by this Court, Plaintiffs' Counsel's reported lodestar totals $226,215.50, yielding a **negative** multiplier of approximately 0.61. Jt. Decl., ¶¶ 27-30; Balint PA Decl., ¶ 21. Plaintiff's Counsel's requested fee award is eminently reasonable. *See, e.g.*, *Corker v. Costco Wholesale Corp.*, No. 2:19-CV-00290-RSL, 2021 WL 2790518, at *2 (W.D. Wash. June 25, 2021) (stating a negative multiplier "confirms the reasonableness of the requested fee"); *Sanchez*, 2021 WL 1813190, at *10 (finding the lodestar cross-check, which yielded a negative multiplier of approximately 0.85, supported the requested fee award); *Facciola v. Greenberg Traurig LLP*, No. CV-10-1025-PHX-FJM, 2012 WL 4711894, at *2 (D. Ariz. Oct. 3, 2012) (approving multiplier cross-check of 1.3); *In re Apollo Grp. Inc. Sec. Litig.*, 2012 WL 1378677, at *7 (approving lodestar cross-check multiplier of 1.74).

**C.    The Court Should Approve Aspen's Payment of Litigation Expenses**

Under the Settlement Agreement, Plaintiff's Counsel agreed to limit our recovery of common fund litigation expenses to an amount not to exceed $12,500.00. Balint PA Decl., ¶ 21; SOS, ¶ 62. Expense awards "should be limited to typical out-of-pocket expenses that are charged to a fee-paying client and should be reasonable and necessary." *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007). The nature and amount of the litigation expenses incurred by Plaintiff's Counsel are $20,378.61 and exceed the amount requested, all as set forth in the tables submitted with the Joint Final Declaration. Jt. Decl., ¶ 38. Given the resources required of complex class litigation of this nature, litigation expenses of $12,500.00 are certainly reasonable in amount, and properly reimbursed to Plaintiffs' Counsel. *See, e.g.*, *Sanchez*, 2021 WL 1813190, at *10.[2]

---

[2] As Class Counsel explained in the Balint PA Decl., ¶ 21, after deducting the amounts for settlement distributions to class members ($381,554.50), the common fund fee request ($137,500.00), Class Counsel's costs ($12,500.00), and the service award ($5,000.00) from the $550,000.00 settlement, a balance of $13,4445.50 remains, which Class Counsel budgeted

14

**D.     The Court Should Approve Aspen's Payment of a $5,000 Service Award**

"Because a named plaintiff is an essential ingredient of any class action, an incentive or service award can be appropriate to encourage or induce an individual to participate in the suit." *Scovil v. FedEx Ground Package Sys., Inc.*, No. 1:10-CV-515-DBH, 2014 WL 1057079, at *6 (D. Me. Mar. 14, 2014) (citation omitted). Service awards "are discretionary and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958–59 (internal citation omitted). As the Supreme Court has reiterated, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods.*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

In the Ninth Circuit, an incentive award of $5,000.00 is "presumptively reasonable." *Carlotti*, 2020 WL 3414653, at *7; *see also Congdon v. Uber Techs., Inc.*, No. 16-cv-02499-YGR, 2019 WL 2327922, at *9 (N.D. Cal. May 31, 2019) ("The Ninth Circuit has repeatedly held that $5,000 is a reasonable amount for an incentive award.") (collecting cases).

Here, Plaintiff Kristen Stewart was the only class representative who undertook to prosecute claims on behalf of the Settlement Class. Jt. Decl., ¶ 41. Ms. Stewart assisted with several aspects of the litigation, including review of the Complaint, participation in several strategic telephone conversations, and attendance at the private mediation. *Id.*, ¶ 43. She also voluntarily submitted herself to the risks in commencing litigation as a named plaintiff, including the potential reputational notoriety often encountered when serving as such advocates. *Id.*

The Court should accordingly approve the common fund payment of a $5,000.00 service award to Ms. Stewart. This very modest service award—which aligns with the

---

$10,000.00 of that amount to fund the anticipated escrow administration expenses. Class Counsel will address the exact balance remaining for escrow distribution and how to apportion those funds at the Final Approval hearing.

presumptively reasonable amount under Ninth Circuit jurisprudence—is neither of the amount nor of the character that could adversely affect either Plaintiff's adequacy as a class representative. Jt. Decl., ¶ 44. *But see Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163–64 (9th Cir. 2013); *Arnett v. Bank of Am., N.A.*, No. 3:11-cv-1372-SI, 2014 WL 4672458, at *11 (D. Or. Sept. 18, 2014) ("Although incentive awards are 'fairly typical in class action cases,' they should be scrutinized carefully to ensure 'that they do not undermine the adequacy of the class representatives.'") (citations omitted). Indeed, under the Settlement Agreement, here Aspen's payment of a service award is expressly **not conditioned** on the Plaintiff's support for the proposed Settlement. SOS, ¶ 62.

## VIII. Conclusion and Relief Requested

For the foregoing reasons, Plaintiff respectfully requests that the Court: (a) certify the Settlement Class under Rules 23(a), 23(b)(3), and 23(e); (b) approve the Proposed Settlement as "fair, adequate, and reasonable;" and (c) approve the common fund payment of attorneys' fees, litigation expenses, and service awards in the requested amounts.

Respectfully submitted this 30th day of November, 2023.

GALLAGHER & KENNEDY, P.A.

*/s/ William F. King*
William F. King
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Rd.
Phoenix, Arizona 85016

Andrew S. Friedman
Francis J. Balint, Jr.
BONNETT, FAIRBOURN, FRIEDMAN
   & BALINT, P.C.
7301 N. 16th Street, Suite 102
Phoenix, Arizona 85020

*Attorneys for Plaintiff*

9745353v1/40940-0001

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November, 2023, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

> Robert R. Berk
> Charles M. Callahan
> 40 N. Central Avenue, Suite 2700
> Phoenix, Arizona 85004
> Attorneys for Aspen
> RBerk@JSHFIRM.com
> CCallahan@JSHFIRM.com

*/s/ DC Hatheway*

9745353v1/40940-0001